AO 91 (Rev. 5/85) Criminal Complaint                                  AUSA Lauren Jorgensen

FILED by _____ D.C.
DEC - 8 2009
STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S.D. OF FLA. - W.P.B.

# United States District Court

_____SOUTHERN_____ DISTRICT OF _____FLORIDA_____

UNITED STATES OF AMERICA
V.
JASON A. VITULANO

## CRIMINAL COMPLAINT

CASE NUMBER: 09-8320-LRJ

(Name and Address of Defendant)

I, the undersigned complainant being duly sworn state the following is true and correct to the best of my knowledge and belief. On or about __between January 2006 and March 2007__ in Palm Beach County, in the __Southern__ District of Florida, and elsewhere, the defendant(s) (Track Statutory Language of Offense)

did knowingly and willfully combine, conspire, confederate, agree and reach a tacit understanding with other persons to commit the offenses of mail and wire fraud, that is, violations of Title 18, United States Code, Sections 1341 and 1344; all

in violation of Title ___18___ United States Code, Section(s) __1349__.

I further state that I am a(n) __Special Agent, U.S. Secret Service__ and that this complaint is based on the following facts:

Please see attached Affidavit.

Continued on the attached sheet and made a part hereof:   ☒ Yes   ☐ No

Signature of Complainant
MATTHEW COPELAND, SPECIAL AGENT
U.S. SECRET SERVICE

Sworn to before me and subscribed in my presence,

DECEMBER 8, 2009                                              at   WEST PALM BEACH, FLORIDA
Date                                                                        City and State

LINNEA R. JOHNSON
UNITED STATES MAGISTRATE JUDGE
Name and Title of Judicial Officer                                  Signature of Judicial Officer

3

## AFFIDAVIT

I, Matthew A. Copeland, being duly sworn, depose and state that:

1. Your affiant has been a Special Agent with the United States Secret Service (USSS) since October 2004. I am currently assigned to the West Palm Beach, FL. Resident Office of the U.S. Secret Service. Prior to that, I served for seven years as a U.S. Pretrial Services Officer, with the United States Courts for the Southern District of Florida. Routine duties of my current employment include the investigation of violations of federal and state laws pertaining to financial institution, wire, and mortgage fraud, as well as other criminal matters.

2. The information in this affidavit is based upon my personal knowledge, information obtained as part of this investigation through interviews, a review of documents obtained through investigative means, information obtained from other law enforcement officers and witnesses. The affidavit contains only the information needed for probable cause to charge and does not purport to contain all facts known to your affiant and law enforcement concerning the investigation. The coconspirators listed in this affidavit will be referred to by the initials of their first and last name.

3. Premium Capital Funding LLC d/b/a TopDot Mortgage Company (hereinafter "TopDot Mortgage") is a New York corporation licensed in Florida to conduct business as a correspondent mortgage lender, with offices in Deerfield Beach and Boca Raton, Florida, and elsewhere.

4. From early 2006 until March 2007, **JASON VITULANO** was employed as branch manager for the TopDot office in Boca Raton, Florida. In this position, **VITULANO** managed loan officers and had authority to place mortgage loans through Premium Capital

Funding LLC. Although **VITULANO** was not a licensed mortgage broker, through his position at TopDot he had the ability to obtain loans for his customers through other mortgage lenders.

5. **JASON VITULANO** caused loan applications and other information to be submitted to mortgage lenders, including Washington Mutual Bank, F.A., Novastar Mortgage Incorporated and First Magnus Financial Corp., that were false or fraudulent in some material fashion, for the purpose of obtaining mortgage financing and to obtain mortgage broker fees for TopDot Mortgage in connection with fraudulent loans.

6. Defendant **JASON VITULANO** and his coconspirators would submit loan applications falsely inflating a loan applicant's salary information and/or falsely attesting to stated monthly earnings, in order to induce the mortgage lender to make the loan.

7. Defendant **JASON VITULANO** and his coconspirators would and did create false and fictitious verification of deposit forms, ("VOD's"), that were used to deceive Washington Mutual and other lenders into believing that a prospective loan applicant had large balances in certain financial accounts, when in truth and in fact the assets represented were either grossly inflated or non-existent. Some of the submitted VOD's contained forged signatures of a bank employee falsely attesting to a loan applicant's financial information and/or non-existent financial accounts.

8. Specifically, **JASON VITULANO** arranged a bank employee of the Boca branch of First Southern Bank, "R. H." who agreed to falsify VOD's for the purpose of verifying to mortgage lenders that a TopDot loan applicant had substantial assets, in order to induce the lender to make the loan. In some cases, R. H. signed blank VOD

forms which he gave to **JASON VITULANO** to be used in connection with loan applications.

9. **JASON VITULANO** and his coconspirators would and did cause entire loan application packages which contained false and fraudulent information to be sent from TopDot's Boca Raton office to the offices of the mortgage lenders, by means of the commercial interstate carrier United Parcel Service.

10. Once a given loan was approved, **JASON VITULANO** and his coconspirators caused the mortgage lenders to wire funds using the interstate wires from states including California, Texas and Ohio to the Southern District of Florida for purposes of funding the approved mortgage loans.

11. Defendant **JASON VITULANO** would and did obtain portions of the wired settlement proceeds under false and fraudulent pretenses by directing that one or more checks and/or wire transfers be issued to TopDot Mortgage as payment of a mortgage brokerage fee.

12. In addition, **JASON VITULANO** used an attorney, who served as the title agent on a number of these loans, and who agreed to provide settlement proceeds by wire transfers and/or checks into the individual bank accounts of **JASON VITULANO** and his coconspirators without telling the lenders that the proceeds were being diverted from the closing instructions as provided on the HUD-1 settlement statement.

13. Among other fraudulent mortgage loans orchestrated by **JASON VITULANO**, the following false loan applications were submitted to lenders by **VITULANO**:

**LIGHTHOUSE POINT**

14. In July 2006, **JASON VITULANO** conspired with TopDot loan applicant "S. V." to obtain mortgage financing from First Magnus of over $1.5 million to purchase a house located at 2530 N. E. 47th Street, Lighthouse Point, FL. In order to persuade First Magnus to make the loan, the loan application – which was signed by **JASON VITULANO** as interviewer – claimed a monthly income for S.V. of $57,850 (including salary and rental income). Interviews and records showed that this figure was vastly inflated over the actual income for S. V.

15. The S. V. loan application claimed that this was to be his primary residence, a material fact considered by the lender in making the decision whether to grant the loan. In fact, after the loan closed, S. V. never occupied this house as his primary residence and owned several other properties which he had also claimed as primary residences.

16. The loan application also claimed that S. V. had a bank account at First Southern Bank with a balance of $148,575.00. First Southern records indicate that S. V. was not an account holder at time of the loan and this account did not exist. Records indicate that accounts actually held by S. V. at other banks never reflected any balance close to that figure during that time period.

17. Based upon the false loan application, on July 25, 2006, First Magnus funded the first and second mortgage loans through wire transfers from Austin, TX totaling $1,513,053.92. Out of these loan proceeds, TopDot Mortgage received commission and fees of over $42,000.

**PARKSIDE CIRCLE, BOCA RATON**

18. In July and August 2006, **JASON VITULANO** and S. V. conspired to submit another false loan application to Novastar seeking mortgage funding of $1.1 million to purchase property located at 887 Parkside Circle North, Boca Raton, FL.

19. The loan application – which was signed by **VITULANO** as interviewer – claimed S.V. had a base employee monthly income of $67,000. No rental income was listed on this application. Again, interviews and records showed that this figure was vastly inflated, and S. V. also claimed this house was to be his primary residence, though again he never resided there after the closing.

20. This loan application also claimed that S. V. had a bank account at First Southern Bank with a balance of $601,119. Once again, First Southern Bank records indicate that S. V. was never an account holder at the bank and this account did not exist, nor did any account held by S. V. ever reflect such a substantial balance.

21. Based upon the false loan application, on August 22, 2006, Novastar funded the mortgage loan through a wire transfer from USB Warburg Real Estate Securities in New York, NY in the amount of $1,106,860.05. Out of these loan proceeds, TopDot Mortgage received a commission of $11,000. On August 23, 2006, **JASON VITULANO** received a telephonic wire transfer from the trust account of coconspirator and title agent J. M. in the amount of $61,142.97 and received another telephonic wire transfer on August 25, 2006, in the amount of $42,092.51. Neither of these transfers to **JASON VITULANO** was reflected on the HUD-1 Settlement Statement.

## LAKE AZURE WAY, BOCA RATON

22. On September 28, 2006, **JASON VITULANO** and coconspirator "V. M." signed a contract to purchase a home located at 17874 Lake Azure Way, Boca Raton, FL at auction for $979,500. Another sales contract was later prepared naming only V. M. (and NOT **VITULANO**) as purchaser, and stating an inflated purchase price of $1.75 million, dated October 2, 2006. Based on that new falsely inflated purchase price, V. M. applied for mortgage financing through **JASON VITULANO** and TopDot Mortgage.

23. **JASON VITULANO** submitted a false loan application for V. M. to Washington Mutual seeking mortgage funding totaling $1,562,500.00 to purchase the property, even though the true purchase price was only $979,500.00.

24. The loan application submitted to Washington Mutual, which was signed by V. M. as applicant, and **JASON VITULANO** as interviewer, claimed a base employee monthly income by V. M. of $33,246.00. Interviews and records showed that this figure was vastly inflated. V. M. also claimed this house was to be his primary residence. In fact, witnesses confirmed that **JASON VITULANO** intended to live in this house, and did in fact move in and occupy this house after the closing.

25. This loan application also claimed that V. M. had a certificate of deposit (c.d.) with a balance of $434,000.00. This bank c.d. was verified by a VOD purportedly signed by coconspirator R. H. on October 23, 2006, showing an average balance of $433,310.00, which was submitted with the loan application. Once again, First Southern records indicate that V. M. was never an account holder at the bank and this

account did not exist, nor did any account actually held by V. M. ever reflect such a balance.

26. Based upon the false loan application, on October 25, 2006, Washington Mutual funded the mortgage loans through two wire transfers from the Washington Mutual office in Stockton, CA in the following amounts: $1,312,500.00 (first mortgage) and $250,000.00 (second mortgage). Out of these loan proceeds, TopDot Mortgage received a commission of $39,375.00.

27. For this transaction, two HUD-1 settlement statements were prepared by the title agent J.M. One showed an earnest money deposit by the purchaser, V. M. of $771,000.00. The other showed no earnest money deposit, but rather showed that the seller was to receive $701.059.00. In fact, the seller of this property received no cash proceeds from this sale, but rather the seller had to wire transfer $34,625.77 to the title agent, coconspirator J. M., in order to close the sale.

28. After the closing, J. M. issued a check payable to **JASON VITULANO** in the amount of $150,721.85 on October 25, 2006. Then, on October 26, 2006, J. M. wire transferred $234,200.00 to V. M.'s BankAtlantic account. Neither of these payments – totaling over $380,000 – was disclosed anywhere in the loan documents, including the HUD-1, nor was the lender told that this money was being disbursed in this way.

29. All three properties discussed above – as well as several others handled by **VITULANO** – are currently in foreclosure proceedings due to nonpayment of the mortgages.

**CONTINUING FRAUD**

30. In March 2007, **JASON VITULANO** was fired by TopDot Mortgage for his involvement in fraudulent loans such as those described above. After being fired by TopDot Mortgage, **JASON VITULANO** continued to work in the mortgage industry and then, in 2008, started a company called FHA All Day, Inc., purportedly to assist homeowners whose homes were at risk for foreclosure, by negotiating loan modifications with their lenders for a substantial up-front fee. The Attorney General for the State of Florida filed a complaint against **VITULANO** in June 2009 for injunctive relief (Case No. 2009CA02434) based on the false and fraudulent representations made by **VITULANO** and others at his direction in charging homeowners $2,000.00 or more up front each for loan modification services. The vast majority of the homeowners never received any of the promised services. The proceeds from the FHA All Day fraud were well over $5 million.

32. The U. S. Secret Service has continued the investigation into the fraudulent practices of FHA All Day, Inc. and successor companies run by **JASON VITULANO** and in July 2009, the Secret Service seized a number of assets belonging to **VITULANO** in connection with that fraudulent activity, including bank accounts with balances of approximately half a million dollars, plus the following:

    2007 Rolls Royce Phantom
    2007 Lamborghini
    2007 Ferrari
    2008 BMW
    2006 Mercedes R350
    2004 Mercedes C240

2006 Ford F350
42' Fountain Racing Boat & Trailer

33. Wherefore I have probable cause to believe that between January 2006 and March 2007, in Palm Beach County. and elsewhere, **JASON VITULANO** did knowingly and willfully combine, conspire, confederate, agree and reach a tacit understanding with other persons to commit the offenses of mail and wire fraud, in violation of Title 18, United States Code, Sections 1341 and 1344; All in violation of Title 18, United States Code, Section 1349, all of which occurred in the Southern District of Florida.

FURTHER AFFIANT SAYETH NAUGHT

_____
MATTHEW A. COPELAND
Special Agent, United States Secret Service

Subscribed and sworn to before me

this _____ day of December, 2009.

_____
LINNEA R. JOHNSON
UNITED STATES MAGISTRATE JUDGE

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

No. 09-8320-LRJ

UNITED STATES OF AMERICA

vs.

CRIMINAL COMPLAINT

_____/

## CRIMINAL COVER SHEET

1. Did this matter originate from a matter pending in the Northern Region of the United States Attorney's Office prior to October 14, 2003?  _____ Yes  __X__ No

2. Did this matter originate from a matter pending in the Central Region of the United States Attorney's Office prior to September 1, 2007?  _____ Yes  __X__ No

Respectfully submitted,

JEFFREY H. SLOMAN
ACTING UNITED STATES ATTORNEY

BY: _____
LAUREN JORGENSEN
ASSISTANT UNITED STATES ATTORNEY
Florida Bar No. 726885
500 S. Australian Avenue, Suite 400
West Palm Beach, FL 33401-6235
Tel: (561) 820-8711
Fax: (561) 659-4526
Lauren.Jorgensen@usdoj.gov